**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) Plaintiff, ) ) v. ) ) AQUA VIE BEVERAGE CORP., et al. ) ) Defendants. ) _____) | Case No. CV 04-414-S-EJL<br><br>**REPORT AND RECOMMENDATION** |

Currently pending before the Court is Plaintiff's Motion for Summary Judgment (Docket No. 62). Having carefully reviewed the record, considered oral arguments, and otherwise being fully advised, the Court enters the following Report and Recommendation.

## I.

## PROCEDURAL HISTORY

Plaintiff Securities and Exchange Commission ("SEC") filed the instant enforcement action against Defendants Aqua Vie Beverage Corporation ("Aqua Vie"); Thomas J. Gillespie, Aqua Vie's Chief Executive Officer ("Gillespie"); and Joseph J. Wozniak, one of Aqua Vie's former officers ("Wozniak") (collectively, "Defendants"), alleging that Defendants: (1) violated the anti-fraud provisions of the securities laws, Section 17 of the Securities Act of 1933 and Section 10b of the Securities Exchange Act of 1934; (2) unlawfully sold unregistered securities of Aqua Vie in violation of Sections 5(a) and 5(c) of the Securities Act; and (3) violated the public reporting requirements of Section 13(a) of the Exchange Act. *Certified Copy of Transfer*

*Order* (Docket No. 1); *Plaintiff's Memorandum in Support of Motion for Summary Judgment*, pp. 4-5 ("Memorandum in Support")(Docket No. 62-2).

Mr. Wozniak consented to a Final Judgment settling all claims Plaintiff brought against him without admitting or denying any of the allegations contained in the Complaint. *See Final Judgment as to Defendant Joseph J. Wozniak* (Docket No. 7). The judgment against Mr. Wozniak includes a two-year penny stock bar, a permanent injunction against violations of Section 5 of the Securities Act, disgorgement, and a civil penalty. *Id.*

Plaintiff now seeks summary judgment on each of its claims against Aqua Vie and Gillespie. *Memorandum in Support*, pp. 28-35. In addition, Plaintiff seeks summary judgment on all of its requested relief, including: (1) a permanent injunction against future violations of the anti-fraud and reporting provisions of the federal securities laws; (2) a two-year bar prohibiting Gillespie from serving as an officer or director of any publicly-traded company; (3) a two-year penny stock bar against Gillespie; (4) disgorgement against Gillespie; and (5) a third-tier civil penalty against Gillespie. *Id.*

## II.

## FACTS

### A.   Parties

Aqua Vie is a Delaware corporation with its principal place of business in Ketchum, Idaho. *Complaint* ¶ 8 (Docket No. 63-2); *Feretic Declaration*, Ex. 3, p. 3 (Docket No. 63-4) (Aqua Vie's Form 10-K for Fiscal Year 2002). Gillespie founded Aqua Vie in 1998 and, at all relevant times, served as Aqua Vie's CEO, president, and sole director. *Complaint* ¶ 9 (Docket No. 63-2); *Answer* ¶ 9 (Docket No. 63-3).

B.      **Aqua Vie's Business**

Aqua Vie is a company in the business of developing, marketing, and selling non-carbonated, spring water beverages.  *Gillespie Affidavit*, p. 1 (Docket No. 74-5).  In August 1999, Aqua Vie merged into a publicly-traded shell company, Barhill Acquisition Company, and borrowed its SEC reporting status.[1]  *Complaint* ¶ 8 (Docket No. 63-2); *Answer* ¶ 8 (Docket No. 63-3).  Aqua Vie was listed on the Over-the-Counter Bulletin Board ("OTCBB") until May 3, 2002.  *Gillespie Affidavit,* p.16 (Docket No. 74-5).

Aqua Vie has developed three lines of beverages, including Hydrators, a line of flavored spring water beverages; Eau Vin, a line of non-alcoholic wines made from spring water; and PurePlay, a line of spring water beverages for children.  *Feretic Declaration*, Ex. 3, p. 4 (Docket No. 63-4) (Aqua Vie's Form 10-K for Fiscal Year 2002).  Of these, only the Hydrator line of products has been produced for sale.  *Id.*

C.      **Aqua Vie's Relationship with Lyons Magnus**

In 1999, Aqua Vie entered into a long-term, bottling contract with Lyons Magnus Company in Fresno, California.  *Feretic Declaration,* Ex. 8 (Docket No. 64-4).  The bottling method used to produce Aqua Vie's product was the patent-protected Remy Aseptic PET Bottling System ("Remy Aseptic System").  *Gillespie Affidavit.* p. 4 (Docket No. 74-5).  For a short time, Aqua Vie's products were also produced at a Remy Aseptic System facility located in Valence, France.  *Id.* at 6.  However, in the 2002 to 2003 time period, Lyons Magnus was the only company making Aqua Vie's products for sale.  *Feretic Declaration*, Ex. 5 (Docket No. 63-6) (2006 Gillespie Deposition).

---

[1]  A public shell company is one that is already registered for public trading but is not currently trading shares.  *S.E.C. v. Poirier*, 140 F.Supp. 2d 1033, 1038 n.1 (D.Ariz. 2001).

Between 1999 and 2001, the Aqua Vie products bottled at the Lyons Magnus plant in Fresno were contaminated with "microbial mold" on six occasions.[2] *Gillespie Affidavit*, pp. 7-8 (Docket No. 74-5). The mold was discovered ten to fourteen weeks after production and after the product had been delivered to store shelves resulting in product recalls. *Id.* at 8. It is undisputed that the mold problem resulted in a depletion of investment capital, loss of potential revenue, accelerated costs, damage to the credibility of the company, decreased sales revenue, and decreased the general value of Aqua Vie as a company. *Id.* at 9,11.

In July 2001, the bottling contract between Aqua Vie and Lyons Magnus was modified to a "Pay-As-You-Go" arrangement. *Feretic Declaration*, Ex.11 (Docket No. 65). Accordingly, Aqua Vie agreed to a minimum production of 25,000 cases per production request or bottling run. *Id.* at 3. The modification did not change the requirement that Aqua Vie provide Lyons Magnus with written ninety (90) day forecasts of its production needs. *Feretic Declaration,* Ex. 8, p. 7 (Docket No. 64-4).

Beginning in at least May of 2002, Lyons Magnus expressed to Aqua Vie its dissatisfaction with Aqua Vie's forecasting and production requests. *Feretic Declaration*, Ex. 12, pp. 1-2 (Docket No. 65-2). On November 7, 2002, Lyons Magnus complained that Aqua Vie's projected production for June 2002 through January 2003, from 25,000 to 50,000 cases per month, was not being followed with actual orders. *Id.* at 3. Lyons Magnus insisted on "realistic projections followed by bona fide orders." *Id.* On November 22, 2002, Aqua Vie responded with the following projected production: 30,000 cases for December 2002 and 150,000 cases total for 2003. *Feretic Declaration*, Ex. 13, p. 3 (Docket No. 65-3).

---

[2] No evidence of contamination was experienced with the production in France. *Gillespie Affidavit.* p. 8.

On December 2, 2002, Lyons Magnus again expressed its dissatisfaction with Aqua Vie's forecasted and actual production and issued a final ultimatum. *Feretic Declaration*, Ex. 12, p. 8 (Docket No. 65-2). In order for Lyons Magnus to move forward with the contract, it required that Aqua Vie would have to complete at least one 25,0000 case production per quarter for a minimum of 100,000 cases per year beginning with the first quarter of 2003 (January through March), or otherwise, the contract would be terminated. *Id.*

On January 30, 2003, Aqua Vie ordered 50,000 12-pack cases from Lyons Magnus but failed to tender payment in full with the purchase order. *Id.* at 9. Lyons Magnus rejected the order on February 6, 2003 indicating that the parties should terminate their relationship. *Id.* On February 20, 2003 Lyons Magnus gave Aqua Vie official notice that the bottling contract would not be renewed. *Feretic Declaration*, Ex. 18, p. 1 (Docket No. 65-8). Aqua Vie did not have another co-packer arrangement at that time. *Feretic Declaration*, Ex. 31 (Docket No. 68).

**D.     Aqua Vie's Renewed Strategy for 2003**

In late 2002, after the mold problem at Lyons Magnus had been resolved, Mr. Gillespie updated his 1999 marketing strategy and sales projections "to complete Aqua Vies [sic] original mission." *Gillespie Affidavit*, p. 11 (Docket No. 74-5). The 2003 plan included:

(1) reformulated and updated improvements to the product lines;

(2) a new sales strategy;

(3) proposed adjustments to the capital structure of Aqua Vie;  and

(4) a proposed public relations effort to inform existing and potentially new shareholders aware that "Aqua Vie, a company that had been underperforming, had structured a plan, and was ready to move."

*Id.*

Aqua Vie needed money to finance the new plan. *Id.* In July 2002, Aqua Vie disclosed that it needed $2.2 million to fund its operations and sales program in 2003. *Feretic Declaration*, Ex. 3, p .4 (Docket No. 63-4) (Aqua Vie's Form 10-K for Fiscal Year 2002).

To help finance the new plan, Gillespie asked shareholder, Joe Wozniak, to sell some of the Aqua Vie stock that Wozniak owned and then to lend the proceeds of that sale to Aqua Vie. *Gillespie Affidavit.* at 14 (Docket No. 74-5). In addition, Aqua Vie prepared and filed an S-8 Registration with the SEC in order to distribute stock through Valerie Gillespie, Mr. Gillespie's sister, for the purpose of compensating contractors for their services. *Id*; *Response to Plaintiff's Motion for Summary Judgment*, p. 17 (Docket No. 74).

**E.      Sales through Wozniak**

Wozniak first became involved with Aqua Vie when he provided services and financing for the company in connection with its bankruptcy filing in 1996. *Feretic Declaration*, Ex. 40, pp. 11-12 (Docket No. 66) (Joseph Wozniak Deposition). In October 1998, Mr. Wozniak became an officer and director of Aqua Vie under "a kind of employment consulting agreement" memorialized in an "Engagement of Service Agreement." *Id.* at 18, 21. Mr. Wozniak held the positions of Vice President and director through April 2000. *Id.* at 27-30. In this capacity, Mr. Wozniak accepted 6,713.867 Series A preferred shares of Aqua Vie, convertible to Aqua Vie common stock. *Plaintiff's Statement of Undisputed Facts*, ¶ 37 (Docket No. 62-3).

In March 2000, Mr. Wozniak converted some of his Series A shares into common stock, sold them, and then loaned the money to Aqua Vie so it could pay its expenses. In exchange, Mr. Wozniak received a convertible note ("Note") for $80,000. *Feretic Declaration*, Ex. 40, pp. 49-51 (Docket No. 66) (Wozniak Deposition). The Note, due in September 2001, was convertible to Aqua Vie common stock at a price no lower than 80 cents per share. *Id.*

REPORT AND RECOMMENDATION 6

After April 2000, Mr. Wozniak's title changed, and he became a consultant to Aqua Vie. *Id.* at 41-44.  As of September 2002, Aqua Vie had not repaid any portion of the Note.  *Id.* at 97. At this time, Gillespie approached Mr. Wozniak and asked him to convert the Note to common stock, sell the stock, and help finance Aqua Vie's resurgence into the marketplace.  *Id.* at 48. The terms of the Note were renegotiated and the conversion price was lowered from 80 cents to five cents per share, vastly increasing the number of shares that could be generated for sale to the public.  *Id.* at 98.

Mr. Wozniak ultimately agreed to use the stock converted from the Note for the benefit of Aqua Vie.  A portion of the stock was sold and Mr. Wozniak returned 80% of the proceeds from these sales to Aqua Vie and retained the remaining 20% to cover his tax liability.  *Id.* at 64. The remaining stock was transferred to third parties as payment for services provided to Aqua Vie.  *Id.* at 71-72, 104-23.

When Mr. Gillespie had sold all of the stock acquired via the Note, Gillespie approached Mr. Wozniak again and proposed that Mr. Wozniak distribute additional common stock to the public by converting Mr. Wozniak's convertible preferred stock into common shares.  *Id.* at 103-05.  At the same time, Aqua Vie also offered to exchange Mr. Wozniak's preferred shares to a new series of preferred shares, Series I.  *Id.* at 103; *Feretic Declaration*, Ex. 56 (Docket No. 72-3).  The Series I stock was convertible at a rate of 10,000 common shares for each preferred share.  *Id.*  In March 2003, the Company proposed a second preferred share exchange, again increasing the number of common shares to which Mr. Wozniak was entitled.  *Feretic Declaration*, Ex. 57 (Docket No. 72-4).

These stock conversions enabled Mr. Wozniak to obtain and sell far more common stock than he would have been entitled to prior to September 2002.  As of May 2003, over six million

unregistered shares had been distributed to the public through Mr. Wozniak's preferred share

holdings and Defendants had obtained $2,268,000 through the sales and distribution to third

parties. *Feretic Declaration*, Ex. 20 (Docket No. 65-10), Ex. 60 (Docket No. 73-3).

Mr. Wozniak did not direct the stock transfers. Instead, Gillespie notified Mr. Wozniak

when the transfers were made, *id.* at 101-02, 162-63, and Gillespie directed when and how much

of Mr. Wozniak's shares would be sold. *Id.* at 88-89, 121-22, 167.

**F.     Sales through Valerie Gillespie**

In February 2003, Valerie Gillespie entered a consulting agreement with Aqua Vie.

*Feretic Declaration*, Ex. 43, pp. 48-69 (Docket No. 69-3) (Valerie Gillespie Deposition).

Accordingly, Ms. Gillespie accepted common stock in Aqua Vie, sold it, and used the proceeds

to pay Aqua Vie's creditors and vendors, as directed by Gillespie. *Id.* Ms. Gillespie was paid a

percentage of all payments and an additional per diem fee. *Id.* at 76-81.

**G.     "Public Relations Campaign:" the Faxed Tout Sheets**

Between September 2002 through April 2003, at the same time Defendants were

distributing stock through Mr. Wozniak and Valerie Gillespie, Defendants hired two fax

broadcasters, POLS Corp. and Fax.com, to fax over 19 million tout sheets[3] to the public. *Feretic*

*Declaration*, Ex. 15, pp. 122-23, 130-33 (Docket No. 63-6) (August 9, 2006 Deposition of

Thomas J. Gillespie); *Feretic Declaration*, Ex. 14 (Docket No. 65-5) (Undated letter from

Gillespie to S.E.C.). Aqua Vie paid both POLS and Fax.com with Aqua Vie stock. *Id.* The fax

campaign was intended to generate interest in Aqua Vie's stock. *Feretic Declaration*, Ex. 5, pp.

122-25 (Docket No. 63-6)(2006 Gillespie Deposition).

---

[3] Defendants do not dispute that the faxes were "tout sheets."

The faxes alternatively state that they are weekly publications of "OTC STOCK TODAY," "OTC TODAY," and "American Investor." *Feretic Declaration*, Ex. 19 (Docket No. 65-9). However, the faxes were prepared by Gillespie. *Feretic Declaration*, Ex. 14 (Docket No. 65-5) (Undated letter from Gillespie to S.E.C.). Aqua Vie holds the claims of copyright and trademark to "OTC STOCK TODAY" and "OTC TODAY." *Id.*

The faxes are not identical. However, they all contain information regarding Aqua Vie's revenue and stock price projections. For example, one fax dated December 20, 2002 states "AQVB [Aqua Vie] has secured valuable shelf space which is expected to generate sales revenue in excess of $7 million for the coming year." *Id.* at 1. Another, dated February 10, 2003 states, "Revenue Dec.31, 2003 est. $6.5 million." *Id.* at 2. In addition, the December 20, 2002 fax states, "3 Month Target: $1.25" and "12 Month Target: $2.65" (*id.* at 1), while the February 10, 2003 fax states "12 Month Target Price: $5.25" (*id.* at 2).

In addition to the revenue and stock price projections, the faxes also make statements regarding patented bottling technology. For example, the December 20, 2002 fax refers to "[p]atented bottling technology" and also states, "AQVB Hydartors are the result of over $30 million dollars, 10 years of research, and patented technology." *Id.* at 1 (emphasis in original). The February 10, 2003 fax more explicitly declares, "Patented technology is substantial 'barrier to entry' for AQVB [Aqua Vie] competition." *Id.* at 2. In addition, both the December 10, 2002 and February 10, 2003 faxes state, "AQVB is perfectly positioned to dominate the 'all-natural' segment of the $100 billion beverage industry!" *Id.* at 1.

In addition to these representations, all of the faxes also contain a disclaimer. *Id*. The disclaimers are not identical; nonetheless, the following serves as a typical example:

> Jordan Richard Assoc., which assisted with the preparation of this report, is not a registered investment advisor or a broker-dealer. Information, opinions and analysis contained herein are based on sources believed to be reliable, but no representation, express or implied, is made as to its accuracy, completeness, or correctness. The opinions contained herein reflect current judgment and are subject to change without notice. Jordan Richard Assoc. accepts no liability for any losses arising from an investor's reliance on or use of this report. This report is for information purposes only, and is neither a solicitation to buy nor an offer to sell securities. Jordan Richard Associates is a paid publicist for Aqua Vie Beverage Corporation, but was not compensated for this report. The company paid communication costs. Certain information included herein is forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to statements concerning manufacturing, marketing, growth, and expansion. Such forward-looking information involves important risks and uncertainties that could affect actual results and cause them to differ materially from expectations contained herein.

*Id*. at 1, 2, 3, 4, 6, 8, 9, 17, 18, 19, 22, 23, 24, 25, 26.

**H.      SEC Filings**

It is undisputed that Aqua Vie's 10-K for the fiscal year ending July 31, 2003 was never filed. *Answer,* ¶ 2 (Docket No. 63-3). Similarly**,** it is undisputed that Aqua Vie's 10-Q for the quarter ending October 31, 2003 was also never filed. *Id.*

**I.      SEC Investigation**

On April 1, 2003, the SEC contacted Aqua Vie about the fax campaign. *Feretic Declaration*, Ex. 14 (Docket No. 65-4). On May 2, 2003, the SEC initiated a trading suspension of Aqua Vie's stock. *Id.*, p. 16. Aqua Vie contends that the SEC's investigation and resulting

costs have "effectively eliminated Aqua Vie's ability to execute its distribution strategy" and reach its revenue goals.  *Id.*

## III.

## SUMMARY JUDGMENT STANDARD

A.   <u>Summary Judgment Standard</u>

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The initial burden is on the moving party to show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983); Fed. R. Civ. P. 56(c).  If the moving party meets its initial burden, the nonmoving party must "produce 'specific facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed."  *Steckl*, 703 F.2d at 393 (quoting *Ruffin v. County of L.A.*, 607 F.2d 1276, 1280 (9th Cir. 1979)).

## IV.

## ANALYSIS

Plaintiff's motion for summary judgment relates to the representations contained in the faxed tout sheets, the sale of Aqua Vie stock through Wozniak and Valerie Gillespie, and the legal sufficiency of Aqua Vie's SEC filings.  SEC contends that: (1) the statements in the faxed tout sheets are misrepresentations prohibited by the anti-fraud provisions of the securities laws;

(2) the sale of Aqua Vie's stock through Wozniak and others did not qualify as registered sales;

and (3) Aqua Vie's SEC filings omitted essential, material information.

## A.      Securities Fraud

Plaintiff alleges that Defendants violated the anti-fraud provisions of: (1) Section 17(a) of

the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and (2) Section 10b of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b).  All of the securities

fraud allegations stem from representations made in Aqua Vie's faxed tout sheets.

Section 17(a) of the Securities Act, which applies only to sellers, prohibits fraud in

connection with the *offer* or *sale* of securities:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the
> use of any means or instruments of transportation or communication in interstate
> commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material
> fact or any omission to state a material fact necessary in order to make the
> statements made, in light of the circumstances under which they were made, not
> misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or
> would operate as a fraud or deceit upon the purchaser.

15 U.S.C.A. § 77q(a).  Section 10b of the Exchange Act, which applies to both buyers and

sellers, and Rule 10b-5 thereunder, prohibit fraud in connection with either the *purchase* or *sale*

of securities.  Section 10b provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange--
> . . .
> (b) To use or employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so registered . . .
> any manipulative or deceptive device or contrivance in contravention of such

REPORT AND RECOMMENDATION 12

rules and regulations as the Commission may prescribe as necessary or
appropriate in the public interest or for the protection of investors.

15 U.S.C.A. § 78j.  Mirroring Section 17(a) of the Securities Act, Rule 10b-5 further provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means
or instrumentality of interstate commerce, or of the mails or of any facility of any
national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material
fact necessary in order to make the statements made, in the light of the
circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would
operate as a fraud or deceit upon any person, in connection with the purchase or
sale of any security.

17 C.F.R. § 240.10b-5.  In addition, Rule 10b-5 expressly makes it unlawful "to omit to state a

material fact necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading."  *Id.*

Section 10b of the Exchange Act and Section 17(a) of the Securities Act require the same

basic elements: (1) material misrepresentations or omissions of fact (2) with the requisite mental

state or *scienter* (3) made in connection with the purchase or sale of securities.  *See SEC v. Dain

Rauscher, Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001).

1.      **Misrepresentations and Omissions**

Plaintiff argues that the faxed tout sheets contain material misrepresentations and

omissions rendering them fraudulent.  *Memorandum in Support*, pp. 8-9 (Docket No. 62-2).

Specifically, Plaintiff contends the faxes contained the following misrepresentations: (1) the

faxes were not investor newsletters; (2) there was no patented technology that served as a barrier

to competition; (3) the claimed new products were never produced; and (4) the beverage market

was not a $100 billion market as represented.  *Id.*  Plaintiff also argues that the tout sheets

"contained wildly inflated revenue and stock price predictions that lacked any reasonable basis."

*Id.* at 9.  In addition, Plaintiff maintains the tout sheets failed to disclose: (1) the stock

predictions were impossible to achieve, (2) the touts were disseminated by a faxing company

that was receiving Aqua Vie shares as payment for its services, and (3) Aqua Vie was "dumping

millions of unregistered shares of its stock, at the same time it was inducing the public to buy

them."  *Id.*

      In response, Defendants generally contend that "[t]he statements contained in the faxes

produced by Fax.com were believed true by Tom Gillespie."  *Defendant's Statement of Disputed*

*Facts*, p. 2 (Docket No. 74-2).  Defendants further contend that statements in the fax were

"tempered by a disclaimer."  *Supplemental Statement of Disputed Facts*, p. 2 (Docket No. 91).

### a.      Faxes as Investor Newsletters

      It is undisputed that the faxes were misrepresented as  "investor newsletters."  The

various names on the faxes indicate that the faxes were developed by an investor news service.

The faxes have headings such as "OTC Today," "OTC Stock Today," and "American Investor,"

indicating that they are weekly publications of an "Over the Counter" stock information service.

*Feretic Declaration,* Ex. 14 (Docket No. 65-4).  In reality, the faxes were not sent out by an

independent investor news service at all, but, rather, were developed by Aqua Vie and Aqua

Vie's publicist, Jordan Richard Assoc.  *Id*.  Moreover, Defendants do not dispute that the faxes

were misrepresented as "investor newsletters."

### b.      Patented Technology as Barrier to Competition

      Defendants argue that "[t]he bottling technology was patented by a third party and was

believed to be a 'barrier to entry.'"  *Response to Plaintiff's Motion for Summary Judgment*, p. 9

(Docket No. 74).  Defendants state, "No one else appeared to be using the technology and Aqua Vie's bottler's difficulties with the process showed that it was in fact a 'barrier.'"  *Id.* at pp. 9-10.

At the very least, Defendants misunderstand the concept of a patent as a "barrier to entry."  A patent constitutes a barrier to entry if it would preclude or hinder a competitor from entering that market.  As the record shows, Aqua Vie did not hold the patent to the patented bottling technology, nor did they have an exclusive license to its use.  *Feretic Declaration*, Ex. 5, pp. 239-41, 250-51 (Docket No. 63-6) (2006 Gillespie Deposition).  While Lyons Magnus had a license to use the patented bottling technology, Lyons Magnus was under no obligation to provide this bottling capability exclusively to Aqua Vie.  *Id.*; Ex. 8 (Docket No. 64-4).  Thus, Lyons Magnus could have offered this same production service to any competitor of Aqua Vie under any terms Lyons Magnus cared to negotiate.  Therefore, Defendants did not enjoy a barrier to entry resulting from a patented technology, and the statements in the tout sheets to the contrary are false.

### c.    $100 Billion Beverage Market

The record does not clearly demonstrate whether the beverage market is or is not a $100 billion market.  In support of its contention that the beverage market is not a $100 billion market, Plaintiff exclusively relies on the testimony of Aqua Vie's food broker, Tom Oneto.  *See Feretic Declaration*, Ex. 7, pp. 177-78 (Docket No. 64-3) (Deposition of Tom Oneto).  Mr. Oneto's testimony is as follows:

> Q: Was there anything in the fax sheet that you received that caused you to be concerned?
>
> A: Well, this one states a hundred-billion-dollar market.  I'm not sure that beverages is a hundred- I don't know what they're measuring here but water isn't a hundred-billion-dollar market, I don't think.  I know in the grocery business, it's a $1,500,000,000

> category.  So adding all other classes of trade - I don't know how
> they - whoever did this I think was misrepresenting the size of the
> market.

*Id.*

This testimony is insufficient to establish, as a matter of undisputed fact, that the faxes

contained a misrepresentation regarding the size of the beverage market.  First, the deposition

testimony appears to be limited to an assessment of the water market.  Second, there is no

foundation in the record for this testimony.  *See* Fed. R. Civ. P. 56(e)[4]; Fed. R. Evid. 702.[5]

At the same time, Defendants have not established that the beverage market was a $100

billion market.  Defendants rely upon a document that states the non-alcoholic beverage retail

market is a $84.9 billion market.  *Supplemental Gillespie Affidavit*, Ex. C. (Docket No. 91-5).

The document cites as its source, the *Beverage World* magazine 2000 survey.  *Id.*  Such a

hearsay statement is not sufficient to establish the size of the beverage market as a matter of law.

*See* Fed. R. Civ. P. 56(e).  Therefore, it is recommended that the factual issue of whether or not

Defendants misrepresented the size of the beverage market be preserved for trial and the trier of

fact.

---

[4] "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).

[5] Fed. R. Evid. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to . . . determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

> **d.**   **PurePlay's Product Placement and Revenue and Stock Price Predictions**

The statements regarding PurePlay and the revenue and stock price predictions contained in the faxes are not statements of current fact, but forward-looking statements or projections regarding the future performance of Aqua Vie and its stock.  "[P]rojections and general expressions of optimism may be actionable under the federal securities laws."  *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1113 (9th Cir. 1989)(citing *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489-92 (9th Cir.1974); *G & M Inc. v. Newbern,* 488 F.2d 742, 745-46 (9th Cir.1973)).  A projection or statement of belief may be actionable to the extent any of the following are not true: "(1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement."  *Id.*

Regarding the PurePlay product, the faxes claim that PurePlay would be entering the market soon.  *Feretic Declaration,* Ex. 19, p. 2 (Docket No. 65-9) ("First Kids Flavored Water to Enter $100 Billion Beverage Market").  In reality, the PurePlay products never reached the stores and Plaintiff contends that the PurePlay product was not ready for imminent market entry. In support of the contention that PurePlay was not in a position for imminent market entry, Plaintiff relies on the fact that the product was never produced for sale and provides examples of Aqua Vie's prior involvement in issues related to premature statements in press releases.  *See Plaintiff's Statement of Facts*, ¶¶ 26-29 (Docket No. 62-3).

The record demonstrates that Defendants had been advertising the imminent introduction of PurePlay and Eau Vin for at least three years.  *Feretic Declaration*, Ex. 36, pp. 251-53 (2006 Gillespie Deposition).  In addition, it is undisputed that the PurePlay line of  products were never

introduced for sale.  However, this record does not settle that the issue was not genuinely

believed by the speaker, that there was no reasonable basis for the belief, or that the speaker was

aware of undisclosed facts tending to undermine the accuracy of the statement.  *See In re Apple*

*Computer Securities Litigation,* 886 F.2d at 1113.  The fact of non-production and allegations of

prior misdeeds do not establish as a matter of law that Defendants misrepresented PurePlay's

imminent market entry.

   With regard to the stock price projections, the faxed tout sheets contain a range of target

stock prices, including a high of $5.25 as a 12-month target (stated in April 2003 fax).  *Feretic*

*Declaration*, Ex. 19, pp. 2-4, 8-9, 18-19, 23, 25-26 (Docket No. 65-9).  Other faxes include 12-

month targets of $2.65 (stated in December 2002 fax), $1.95 (stated in September 12, 2002 fax),

and $1.55 (stated in September 17, 2002 fax).  *Id.* at 1, 6, 10, 11, 17, 22.

   In support of the misrepresentation claim, Plaintiff explains that between May 2001 and

October 2002, the highest price for Aqua Vie stock was $.19 per share.  *Feretic Declaration*, Ex.

34 (Docket No. 68-4).  In addition, Plaintiff explains that the only support Defendants have

provided for the stock price projections is that Gillespie had expected Aqua Vie's share price to

climb as high as the tout sheet projections when people became aware of his product.  *Feretic*

*Declaration*, Ex. 5, p. 93 (Docket No. 63-6)(2006 Gillespie Deposition).  Moreover, while

Defendants were making these stock price projections, they were simultaneously distributing

millions of shares of stock to the public.

   Even if the stock price projections were genuinely believed as Defendants claim, there is

no support in the record to demonstrate a reasonable basis for this belief.  Further, Mr. Gillespie

was aware of undisclosed facts tending to undermine the accuracy of the statement.  These facts

are specific to Aqua Vie's performance, including the imminent termination of the Lyons

Magnus contract and lack of excitement among Aqua Vie's distributors.  *Feretic Declaration*,

Ex. 18 (Docket No. 65-8); *Feretic Declaration*, Ex. 33 (Docket No. 68-3).  Thus, the record

indicates that the stock price projections were misrepresented.

    With regard to the revenue projections, the record is clear that the revenue projections

contained in the faxed tout sheets were impossible for Defendants to meet under the

circumstances.  In order to meet the $7 million in revenue set forth in the fax, Aqua Vie would

have to sell, on average, 80,000 cases of 12 bottle cases (960,000 for the year).  *Feretic*

*Declaration*, Ex. 14, p. 3 (Docket No. 65-4).  However, at the same time the tout sheets were

being faxed, Gillespie informed his sole co-packer, Lyons Magnus, that he would need a total of

180,000 12-bottle cases in all of 2003.  *Feretic Declaration*, Ex. 13 (Docket No. 65-3).  This

production clearly would not allow Aqua Vie to meet the revenue projections set forth in the fax.

Moreover, Lyons Magnus informed Defendants in November 2002 that it would be terminating

its bottling agreement in June 2003, and Defendants have set forth no evidence that Defendants

were in the process of finding an alternate co-packer relationship.  In addition to these problems

with its product supply, Aqua Vie also appeared to be having problems with distributors.  *See*

*Feretic Declaration*, Ex. 33 (Docket No. 68-3).

    In light of all of the above, it is recommended that the district court find, as a matter of

law, that the stock and revenue projections, although future-looking, constitute

misrepresentations.  These forward-looking statements, even if believed, were not reasonable in

light of all the information known to Defendants.

        e.    **Omissions of Fact**

    Plaintiff argues that the faxed tout sheets omitted certain material facts, including: (1) the

stock predictions were impossible to achieve; (2) the touts were disseminated by a faxing

company that was receiving Aqua Vie shares as payment for its services; and (3) Aqua Vie was distributing millions of shares of its stock in the market.  As discussed above, the record shows that the stock predictions were without reasonable foundation.  The record also establishes that Aqua Vie paid POLS and Fax.com with stock (*Feretic Declaration*, Ex. 15, pp. 122-23, 130-33 (Docket No. 63-6)(2006 Deposition of Thomas J. Gillespie)), and that Aqua Vie was distributing millions of shares of its stock in the market (*Feretic Declaration*, Ex. 20 (Docket No. 65-10), Ex. 60 (Docket No. 73-3)).  Thus, the record demonstrates that the facts Plaintiff argues should have been included in the faxes were in fact true.  In addition, a  review of the faxes shows that these facts were omitted from the overwhelming majority of the faxes.[6]  Thus, the remaining issue is whether the omitted facts, together with the misrepresentations, constitute material information.

## 2.      Materiality of Misrepresentations and Omissions

The materiality of a statement "depends on the significance the *reasonable investor* would place on the withheld or misrepresented information."  *U.S. v. Smith*, 155 F.3d 1051, 1064 (9th Cir. 1998) (citing *Basic v. Levinson*, 485 U.S. 224, 240 (1988) (emphasis added)).  "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available."  *Id*.

Determining whether an omission is material "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Fecht v. Price,* 70 F.3d 1078, 1080 (9th Cir. 1995) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426

---

[6]  Some of the faxes distributed by POLS state that POLS was paid with Aqua Vie stock. *Feretic Declaration*, Ex. 19, pp. 10-11 (Docket No.65-9).

U.S. 438, 450 (1976)).  Thus, only if materiality is "so obvious that reasonable minds [could] not differ" is summary judgment appropriate. *Id.* at 1081 (quotations and citations omitted).

In this case, the disclaimer raises an issue of fact that precludes granting summary judgment to Plaintiff on the issue of materiality.  Each of the faxes contained a disclaimer indicating that the statements contained therein were "opinions" prepared with the assistance of "a paid publicist for Aqua Vie Beverage Corporation." *Feretic Declaration*, Ex. 19 (Docket No.65-9).  Some of the faxes also provide that "OTC Stock Today" is a trademark belonging to Aqua Vie. *Id.* at 5, 7, 13, 14, 15, 16, 20, 21.  At least two faxes also state that the faxing company "has been hired by a third party consultant and is contracted to receive 150,000 free trading shares for the publication and circulation of this report." *Id.* at 10,11.  Moreover, the entire presentation of the fax, which could reasonably be read as more of an advertisement than an objective stock assessment, could arguably have put a reasonable potential investor on alert that the "newsletter" was really a means of advertising the stock.

The disclaimer also raises an issue of fact regarding materiality, because it is relevant to the significance a reasonable investor would attach to the misstatements and omissions contained therein.  With the disclaimer in the total mix of information available, the issue of materiality is not so obvious that reasonable minds could not differ on the outcome.  Therefore, it is recommended that the factual issue of materiality be preserved for trial and the trier of fact.

3.    *Scienter*

*Scienter* is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976); *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 (9th Cir. 1990) (en banc).  *Scienter* may also be established through proof of recklessness. *Hollinger*, 914 F.2d at 1568-69.

Reckless conduct is defined as "a highly unreasonable omission, involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."   *Id.* at 1569 (quoting *Sundstrand Corp. v. Sun. Chem. Corp.*, 533 F.2d 1033, 1045 (7th Cir. 1977)).  "[T]he danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing, and the omission must derive from something more egregious than even 'white heart/empty head' good faith." *Id.* at 1569-1570.  Moreover, mere "puffery" or "misguided optimism" is not actionable as fraud.  *Rombach v. Chang*,  355 F.3d 164, 175 (2nd Cir. 2004).

Circumstantial evidence may be sufficient to prove *scienter* due to the "difficulty of proving the defendant's state of mind."  *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996) (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n. 30 (1983)).  However, s*cienter* is a fact-specific issue ordinarily left for trial.  *Provenz v. Miller,* 102 F.3d 1478, 1489 (9th Cir. 1996) ("Generally, *scienter* should *not* be resolved by summary judgment.").  "[S]ummary judgment on the *scienter* issue is appropriate *only* where "there is no rational basis in the record for concluding that any of the challenged statements was made with requisite *scienter*." *Id.* at 1490 (citing *In re Software Toolworks*, 38 F.3d 1078, 1088 (9th Cir.1994)).

Plaintiff argues that "Gillespie acted with actual knowledge and fraudulent intent, or at a minimum with reckless disregard for the truth or falsity of his public statements."  *Memorandum in Support*, p. 11 (Docket No. 62-2).  In support of this argument, Plaintiff relies on the misstatements of fact in the faxes, including Gillespie's projected $7 million in revenue that would have required average monthly production of 80,000 cases or 960,000 cases for the year.

*Id.*  At the same time Mr. Gillespie made these statements, he was advising his sole co-packer that he would need only 180,000 cases for the year and knew that his co-packer intended to terminate the bottling contract.  *Id.*  Moreover, when questioned about these omissions, Mr. Gillespie informed Plaintiff that the projections assumed depended upon "co-packer availability," a caveat omitted from the tout sheets.  *Feretic Declaration*, Ex. 14, p. 4 (Docket No. 65-4).  The Commission argues that "Gillespie's deliberate omission of this critical information from his tout sheets (while including it in his statement to the Commission) demonstrates not only its materiality in the context of his public statements, but also Gillespie's culpable *scienter*.  *Memorandum in Support*, p.12 (Docket No. 62-2).

In response, Defendants argue that Mr. Gillespie believed the statements in the fax were true and the revenue and stock projections were reasonable.  *Defendant's Statement of Disputed Facts*, p. 2 (Docket No. 74-2); *Supplemental Statement of Disputed Facts*, p. 2 (Docket No. 91). Defendants also provide to the Court affidavits from two other individuals who also claim that the revenue and stock predictions, were reasonable.  *Affidavit of Bruce Butcher*, pp. 10-12 (Docket No. 74-3); *Affidavit of John Good*, p. 2 (Docket No. 74-4).

Both Mr. Gillespie and Mr. Butcher's stated belief in Aqua Vie's potential revenue appears to be based on a focus on consumer demand for Aqua Vie's products.  Mr. Gillespie's testimony focuses on the potential of the product, its attributes, and product placement in late 2002.  *Gillespie Affidavit,* pp. 2-3, 12-14 (Docket No. 74-5).  In addition, Mr. Butcher emphasizes that he believed, based on the representations of industry "experts," that Aqua Vie's products would result in "major sales."  *Affidavit of Bruce Butcher*, p. 11 (Docket No. 74-3). While Mr. Gillespie and Mr. Butcher's testimony is focused on product placement, consumer

Case 1:04-cv-00414-EJL-LMB   Document 95   Filed 05/14/07   Page 24 of 36

demand and sales, Mr. Good's testimony is that it would be logistically possible to produce 930,000 cases of Aqua Vie's product. *Affidavit of John Good*, p.2 (Docket No. 74-4).

This focus on projected demand and possible production ignores the undisputed supply problems with Lyons Magnus, which render the revenue projections impossible to achieve. Nonetheless, in light of Mr. Gillespie's stated belief, supported by the sworn testimony of Mr. Butcher and Mr. Good, a reasonable juror could find that Mr. Gillespie lacked sufficient *scienter*. The record does not clearly demonstrate that Mr. Gillespie's assertions were made with something beyond "white heart/empty head" good faith or misguided optimism. Thus, it is recommended that the district court preserve the issue of *scienter* for trial and a determination by the trier of fact.

### 4.    "In Connection With" the Purchase or Sale of Securities

"[T]he 'in connection with' requirement is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any security transaction.'" *S.E.C. v. Rana Research, Inc.*, 8 F.3d 1358 (9th Cir. 1993)(quoting *S.E.C. v. Clark*, 915 F.2d 439, 449 (9th Cir. 1990)).  In SEC enforcement actions, the connection requirement is satisfied whenever assertions are made in a manner reasonably calculated to influence the investing public. *Id.*  More specifically:

> Where the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the "in connection with" requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission.

*Id.*

The faxed tout sheets meet the "in connection with" requirement.  The assertions were made in a manner reasonably calculated and, in fact, intended to influence the investing public. The faxes were titled, "OTC Today" and "OTC Stock Today," and "American Investor." *Feretic*

REPORT AND RECOMMENDATION 24

*Declaration*, Ex. 19 (Docket No. 65-9).  Further, each of the faxes contains information about Aqua Vie's stock, including the stock symbol on the Over the Counter Bulletin Board, the outstanding shares, and target stock prices.  Defendants do not dispute these facts.  Therefore, Plaintiff has established, as a matter of law, that the statements made in the tout sheets were made in connection with the offer and sale of securities.

In sum, it is recommended that the district court find, as a matter of law, that Defendants misrepresented: (1) the faxes were "investor newsletters;" (2) the patented bottling technology served as a barrier to competition; (3) future revenue projections; and (4) future stock projections.  In addition, it is recommended that the district court find as a matter of law that Aqua Vie, in the faxed tout sheets, omitted the facts that (1) the stock predictions were impossible to achieve; (2) the touts were disseminated by a faxing company that was receiving Aqua Vie shares as payment for its services; and (3) Aqua Vie was distributing millions of shares of its stock in the market.

Nonetheless, it is recommended that the district court preserve for trial the issues of materiality and *scienter*, along with the questions of whether Aqua Vie misrepresented the size of the beverage market and the imminence of the PurePlay product placement.

**B.      Unregistered Sales**

Plaintiff claims that Defendants unlawfully sold unregistered securities of Aqua Vie through Mr. Wozniak and Ms. Gillespie in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).  Defendants claim the sales through Mr. Wozniak were exempt from registration and the sales through Ms. Gillespie were properly registered as S-8 securities.

The Securities Act forbids the offer or sale of unregistered securities.  Section 5(a) of the Securities Act provides that unless a registration statement is in effect as to a security, it shall be

unlawful for any person, directly or indirectly, to sell the security through the use of any means

or instrument of transportation or communication in interstate commerce or the mails.  15

U.S.C.A. § 77e(a).  Section 5(c) makes a similar provision as to an *offer* or sale.  15 U.S.C.A. §

77e(c)(emphasis added).

### 1.      Sales through Mr. Wozniak

Defendants do not dispute that the shares sold through Mr. Wozniak were not registered.

*See Answer* ¶ 45 (Docket No. 62-4).  They argue that the sales were exempt from registration as

Mr. Wozniak is not an issuer, underwriter or dealer under 15 U.S.C. § 77d(1).  *Response to*

*Plaintiff's Motion for Summary Judgment*, p. 12 (Docket No. 74).

Because it is undisputed that the sales through Mr. Wozniak were not registered,

Defendants have the burden of proof in establishing the sales through Mr. Wozniak were exempt

from registration.  "Once the SEC introduces evidence that a defendant has violated the

registration provisions, the defendant then has the burden of proof in showing entitlement to an

exemption."  *S.E.C. v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980).  The exemptions from

registration provisions are construed narrowly and must be construed in light of the purpose of

the Securities Act: "To provide full and fair disclosure of the character of the securities . . . and

to prevent frauds in the sale thereof."  *S.E.C. v. Blazon Corp.*, 609 F.2d 960, 968 (9th Cir. 1979);

*S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 124-125 (1953).

The Securities Act provides an exemption from registration for "transactions by any

person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(1).  Case law emphasizes

that this provision exempts certain *transactions* from the registration requirements of the

Securities Act.  *See S.E.C. v. Murphy*, 626 F.2d at 648.  The rule is designed "to exempt routine

trading transactions with respect to securities already issued and not to exempt distributions by

issuers or acts of others who engage in steps necessary to such distributions." *Id.*  Thus, even if a

particular defendant is not an issuer, underwriter or dealer," the transaction is not exempt "if the

offer or sale of unregistered securities in question was part of a transaction by someone who was

an issuer, underwriter, or dealer." *S.E.C. v. Holschuh*, 694 F.2d 130, 138 (2nd Cir. 1982).

Defendants argue that the transactions are exempt, because Mr. Wozniak is not a

statutory underwriter. *Response to Plaintiff's Motion for Summary Judgment*, pp. 12-15 (Docket

No. 74).  Nonetheless, even assuming *arguendo* that Mr. Wozniak is not an underwriter pursuant

to the statute, the undisputed facts in the record demonstrate that the sale of Aqua Vie securities

through Mr. Wozniak were not exempt from registration, because the issuer of stock, Aqua Vie,

was a substantial, necessary participants in these transactions.  On behalf of Aqua Vie, Gillespie

solicited the sales by Mr. Wozniak (*Feretic Declaration*, Ex. 20, pp. 48-59, 103-05 (Wozniak

Deposition); Ex. 56, Ex. 57); directed the distribution of shares to third parties (*id.* at Ex. 20, pp.

71-72, 101-02, 162-63); authorized the incremental release and timing of common shares to Mr.

Wozniak (*id.* at 88-89, 121-22, 167); and negotiated the terms under which Mr. Wozniak would

"loan" the proceeds of his sales back to Aqua Vie (*id.* at 98, 103-05; Ex. 56; Ex. 57).

The only factual dispute raised by Defendants on this issue is that Mr. Wozniak was not

controlled by Aqua Vie, as he was under no obligation upon selling his Aqua Vie stock, to return

the proceeds to the Company. *Butcher Declaration*, pp. 4-5 (Docket No. 74-3).  Nonetheless, the

issue of whether Mr. Wozniak was under a legal obligation to apply the proceeds from the sale

of Aqua Vie stock back to Aqua Vie  does not raise a genuine issue of material fact.  The record

demonstrates that the entire debt conversion scheme was proposed and directed by Gillespie on

behalf of Aqua Vie. *Feretic Declaration*, Ex. 20, pp. 48-59, 103-05 (Wozniak Deposition).

Gillespie asked Mr. Wozniak to remit the proceeds back to Aqua Vie and Mr. Wozniak agreed.

REPORT AND RECOMMENDATION 27

*Id.*  Whether or not Mr. Wozniak was legally obligated to apply the proceeds as he did is immaterial, since the entire scheme was fashioned under the assumption that Mr. Wozniak would loan the proceeds back to Aqua Vie as he did at an agreed upon rate of 80%.  *Id.* at 64.  In fact, Gillespie made the phone calls and determined when Mr. Wozniak's stock would be sold and to whom and then reported such sales to Mr. Wozniak for accounting purposes.  *Id.* at 101-02, 162-63.

Thus, the sale of Mr. Wozniak's stock in Aqua Vie necessarily involved an issuer of stock and cannot be exempt from the securities registration requirements.  Therefore, it is unnecessary to address whether Mr. Wozniak is an underwriter within the meaning of the Securities Act and rules promulgated thereunder.  Further, because it is undisputed that the Aqua Vie stock distributed through Mr. Wozniak was not registered, it is recommended that the district court enter judgment for Plaintiff on the claim that the sales of Aqua Vie stock through Mr. Wozniak violated Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).

## 2.    **Valerie Gillespie and the S-8 Form**

Defendants assert that the shares distributed through Ms. Gillespie were lawfully registered via the S-8 form.  *Response to Plaintiff's Motion for Summary Judgment*, p. 17 (Docket No. 74).  "The SEC's Form S-8 provides an abbreviated registration procedure for securities offered or sold to an issuer's employees, including consultants, under certain conditions."  *S.E.C. v. Universal Exp., Inc.*, 475 F.Supp.2d 412, 416 (S.D. N.Y. 2007).  S-8 registration allows a company to issue stock as part of an employee benefit plan.  *See* 17 C.F.R. § 239.16b.  An "employee benefit plan" is defined as:

> [A]ny written purchase, savings, option, bonus, appreciation, profit sharing, thrift, incentive, pension or similar plan or written compensation contract solely for employees, directors, general partners, trustees (where the registrant is a business

REPORT AND RECOMMENDATION 28

trust), officers, or consultants or advisors. However, consultants or advisors may participate in an employee benefit plan only if:

(1) They are natural persons;

(2) They provide bona fide services to the registrant; and

(3) The services are not in connection with the offer or sale of securities in a capital-raising transaction, and do not directly or indirectly promote or maintain a market for the registrant's securities.

17 C.F.R. § 230.405.

In 1999, the S.E.C. amended the S-8 form and issued a Release pertaining to the amendments. *See S.E.C. v. DCI Telecommunications, Inc*., 122 F.Supp.2d 495, 501 (S.D.N.Y. 2000) (citing Registration of Securities on Form S-8, SEC Releases No. 33-7646, 34-41009, 1999 WL 95488, *6 (S.E.C. Feb. 25, 1999)).  The Release makes clear that consultants may participate in an employee benefit plan provided they provide bona fide services to the issuer and those services are not in connection with the offer or sale of securities in a capital raising transaction, and do not directly or indirectly promote or maintain a market for the registrant's securities.  *Id.*

It is undisputed that the stock distributed to Ms. Gillespie was first sold to the public on the open market and then the proceeds from the sale were used to pay Aqua Vie's "consulting vendors."  *Butcher Declaration* at p. 9 (Docket No. 74-3); *Feretic Declaration*, Ex. 43, pp. 48-69 (Docket No. 69-3) (Valerie Gillespie Deposition).  While Ms. Gillespie was paid a percentage of all payments she made, her central role was to sell the stock issued to her pursuant to the S-8 registration for Aqua Vie's benefit and at Aqua Vie's direction.  *Feretic Declaration*, Ex. 43, pp. 76-81 (Docket No. 69-3) (Valerie Gillespie Deposition).

This is not the type of "employee benefit plan" contemplated under the applicable regulations. In fact, this is the exact type of "capital raising transaction" prohibited by S.E.C. regulations. *See S.E.C. v. DCI Telecommunications, Inc.*, 122 F.Supp.2d at 501 ("Regardless of intent, a public company and its officers violate the registration provisions by using employees as conduits for the sale of S-8 stock to the public because the true transaction-the distribution of securities to the public-is not registered."). Furthermore, even if the initial transaction, issuing the securities to the employee, is covered by S-8, the subsequent sales are not. *See S.E.C. v. Cavanagh,* 155 F.3d 129, 133 (2nd Cir. 1998) (citing *Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 648 (7th Cir. 1990)).

Thus, the undisputed facts demonstrate that Defendants' reliance on the S-8 registration was in error. It is therefore recommended that the district court enter judgment for Plaintiff on the claim that the sales of Aqua Vie stock through Ms. Gillespie were not lawfully registered in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).

## C.    S.E.C. Reporting Violations

Section 13(a) of the Exchange Act requires the issuer of a security to file annual and quarterly reports with the S.E.C. *See* 15 U.S.C. § 78m(a). Annual reports must be completed "on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement." 17 C.F.R. § 240.13a-1 ("Rule 13a-1"). Similarly, quarterly reports are due "the first three quarters of each fiscal year of the issuer, commencing with the first fiscal quarter following the most recent fiscal year for which full financial statements were included in the registration statement." 17 C.F.R. § 240.13a-13 ("Rule 13a-13").

Both annual and quarterly reports must be certified.  *See* 17 C.F.R. § 240.13a-14 (Rule 13a-14).  "Each principal executive and principal financial officer of the issuer, or persons performing similar functions, at the time of the filing of the report must sign a certification."  *Id.*  In addition, the statements and reports filed with the S.E.C. must contain all information necessary to ensure that the statements are not misleading.  *See* 17 C.F.R. § 240.12b-20 ("Rule 12b-20").  "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."  *Id.*

1.      **False and Misleading Reports**

Plaintiff contends that Aqua Vie's quarterly reports on Form 10-Q for its quarters ending January 31, 2003 ("January 10Q") and April 30, 2003 ("April 10-Q") were inaccurate, because they did not disclose: (1) Aqua Vie's arrangement with Fax.com; (2) the unregistered sale of newly issued common stock into the retail market by Fax.com and Wozniak, "which significantly increased the float of Aqua Vie Stock;" and (3) the capital-raising transactions by Wozniak and Gillespie.  *Memorandum in Support*, p. 14 (Docket No. 62-2).  In addition, Plaintiff maintains that the April 10-Q also failed to disclose termination of the Lyons Magnus supply agreement.  *Id.*

Defendants state in response that "[t]he filings speak for themselves."  *Response to Plaintiff's Motion for Summary Judgment*, p. 11 (Docket No. 74).  Defendants further explain, "The information was disclosed and was truthful.  The Plaintiff believes more should have been said, but at the very least, this is a disputed questions [sic] of fact that should be decided by weighing all of the evidence on this point."  *Id.*

Defendants do not address Plaintiff's argument, which is that the filings were misleading for what they omitted, i.e., the faxing campaign, the unregistered sale of newly issued common stock into the retail market by Fax.com and Wozniak, and the capital-raising transactions by Wozniak and Gillespie.  Thus, it is undisputed that the January 10Q and April 10Q failed to include these facts.  Nonetheless, the issue of whether these omissions constitute a reporting violation must be preserved for trial as it is necessary for a fact-finder to determine whether the omissions constitute *material* facts that must be included in the reports in order to render the reports as being not misleading.

### 2.      Failure to File Annual Report and Quarterly Report

Plaintiff also contends that Aqua Vie violated Rule 13a-1  by failing to file: (1) an annual report on Form 10-K for the fiscal year ending July 31, 2003 and (2) the quarterly report due December 16, 2003.  *Memorandum in Support*, p. 22 (Docket No. 62-2).  Defendants do not dispute these facts and conceded them at the hearing.  Because there is no dispute of fact regarding this issue, Plaintiff is entitled to summary judgment as a matter of law.

### 3.      Gillespie's Liability for Reporting Violations

Plaintiff seeks to hold Mr. Gillespie liable for Aqua Vie's reporting violations as a "controlling person" pursuant to Section 20(a) of the Exchange Act.  *See* 15 U.S.C.A. § 78t(a).  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*Id.*

REPORT AND RECOMMENDATION 32

"To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).  In support of finding Gillespie liable as a "controlling person," Plaintiff relies on the undisputed facts that: (1) Gillespie is the sole officer and director of Aqua Vie (*Feretic Declaration*, Ex. 3, p. 3 (Docket No. 63-4)) and (2) Gillespie signed the January 10-Q and April 10-Q, certifying that he had reviewed the filings and they did not contain any untrue statement of material fact or material omission of fact.  *Feretic Declaration*, Exs. 28 and 29 (Docket Nos. 67-3, 67-4).  In addition, the record shows that, in addition to Mr. Gillespie, there were three employees working for Aqua Vie.  *Feretic Declaration*, Ex. 6, pp. 28-29 (Docket No. 63-5).  The additional employees all provide administrative or clerical support for Aqua Vie.  *Id.*

These facts demonstrate that Mr. Gillespie directly controlled Aqua Vie for the purpose of establishing liability as a "controlling person."  Therefore, to the extent Aqua Vie is found to have violated the reporting requirements, Mr. Gillespie will also be held liable as a matter of law as a "controlling person."  Because the issue of whether Aqua Vie filed false and misleading reports is preserved for trial, Mr. Gillespie's liability will also be preserved.  Nonetheless, Mr. Gillespie is liable for Aqua Vie's failure to file  (1) an annual report on Form 10-K for the fiscal year ending July 31, 2003 and (2) the quarterly report due December 16, 2003.

## V.

## PLAINTIFF'S REQUESTS FOR RELIEF

Plaintiff seeks the following relief: (1) a permanent injunction against Defendants prohibiting them from future violations of the anti-fraud and reporting provisions of the securities laws; (2) an order barring Gillespie from acting as an officer or director of any publicly

traded company; (3) an order barring Gillespie from participating in the offering of penny stock;

(4) an order requiring Defendants to disgorge any ill-gotten gains; and (5) a third-tier penalty

under the Securities Act. *Plaintiff's Memorandum in Support*, pp. 28-35 (Docket No. 62-2).

These issues should be preserved for trial when the facts regarding misrepresentation and

*scienter* have been fully vetted and determined by the fact-finder.

## VI.

## CONCLUSION

With regard to securities fraud, the record shows, as a matter of law, that Defendants

misrepresented: (1) the faxes as investor newsletters; (2) the patented technology as a barrier to

competition; (3) revenue projections; and (4) stock price projections.  In addition, Defendants

omitted the facts that (1) the stock predictions were impossible to achieve; (2) the tout sheets

were disseminated by a faxing company that received Aqua Vie stock for its services; and (3)

Aqua Vie was distributing millions of shares of stock in the market.  The record before the Court

also shows that these misrepresentations and omissions were made in the connection with the

offer or sale of securities.  Nonetheless, factual disputes regarding materiality and *scienter*

preclude summary judgment on Plaintiff's securities fraud claims.  Similarly, with regard to the

alleged misleading quarterly reports, the issue of materiality precludes summary judgment on

these claims.

In contrast, the record shows, as a matter of law, that the securities sold through Joseph

Wozniak and Valerie Gillespie violated Section 5 of the Securities Act.  In addition, the record

shows that Aqua Vie violated the securities laws by failing to file an annual report on Form 10-K

for the fiscal year ending July 31, 2003 and the quarterly report due December 16, 2003 and that

Defendant Gillespie is liable for the reporting violations as a "controlling person" under Section 20(a) of the Securities Act.

## VII.

## RECOMMENDATION

Based on the foregoing, it is recommended that the District Court enter an order granting in part and denying in part Plaintiff's Motion for Summary Judgment (Docket No. 62).  As set out more specifically above, Plaintiff has demonstrated that it is entitled to judgment as a matter of law with regard to:

1.    Claim One against Aqua Vie and Mr. Gillespie for the sale of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C.A. §§ 77e(a) and (c); and

2.    Claim Three against Aqua Vie for failure to file a 10-K for the fiscal year that ended on July 31, 2003 and a 10-Q for the quarter that ended on October 31, 2003 in violation of Section 13(a) of the Exchange Act, 15 U.S.C.A. § 78m(a) and against Mr. Gillespie as a controlling person of Aqua Vie.

3.    Summary judgment should be denied on the remaining claims for the reasons stated in this Report and Recommendation.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636 and District of Idaho Local Civil Rule 72.1.  If written objections are not filed within the specified time, the right to raise factual and/or legal objections in the Ninth Circuit Court of Appeals may be waived.



DATED:  **May 14, 2007**.

Honorable Larry M. Boyle
U. S. Magistrate Judge